UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

L.P. CIVIL ACTION

VERSUS

CMI, INC. (DE), ET AL. NO. 24-00401-BAJ-RLB

# RULING AND ORDER

This case arises from alleged, persistent workplace sexual harassment and an alleged incident of sexual assault that occurred on May 26, 2023. Before the Court is Plaintiff's **Motion For Partial Summary Judgment On The Issue Of Vicarious Liability (Doc. 93)**, in which Plaintiff seeks a Ruling that Defendant CMI is vicariously liable for the May 26 sexual assault. Also before the Court is Defendant CMI's Opposition to the Motion (Doc. 109), Plaintiff's Reply (Doc. 111), and CMI's Sur-reply (Doc. 128). For the reasons that follow, Plaintiff's Motion (Doc. 93) will be **GRANTED**.

## I. BACKGROUND

The facts set forth below are drawn from the Parties' competing statements of material facts and the competent summary judgment evidence submitted in support of these pleadings.

At all relevant times, Defendant Copeland and Plaintiff were employees of Defendant CMI. (Doc. 93-7 ¶ 1; Doc. 109-1 ¶ 1). They worked in-person at Defendant CMI's Baker, Louisiana office. (Doc. 93-7 ¶ 2; Doc. 109-1 ¶ 2). Director Copeland was Plaintiff's direct supervisor from 2016 through May 30, 2023. (Doc. 93-7 ¶ 3; Doc. 109-

1 ¶ 3). Plaintiff was required to follow all reasonable job-related instructions given to her by Defendant Copeland. (Doc. 93-7 ¶ 4; Doc. 109-1 ¶ 4). On May 26, 2023, during regular working hours, Plaintiff and Defendant Copeland were working at CMI's office when Defendant Copeland called Plaintiff on her desk phone and asked her to come to his private office to discuss work-related invoices. (Doc. 93-7 ¶¶ 5, 15; Doc. 109-1 ¶¶ 5, 15).

Defendant Copeland testified that his purpose for calling Plaintiff to his office "was two-fold. One, for [CMI's] business to go over [] invoices, and one, . . . I wanted to see her butt one more time because this was a Friday and she was wearing those tight jeans." (Doc. 93-7 ¶ 32; Doc. 109-1 ¶ 32). Defendant Copeland testifies that he intended to review the invoices with Plaintiff. (Doc. 93-7 ¶ 6; Doc. 109-1 ¶ 6). As part of her work-related duties, Plaintiff was required to follow Defendant Copeland's instruction to go to his office. (Doc. 93-7 ¶ 7; Doc. 109-1 ¶ 7).

Plaintiff left her desk and walked to Defendant Copeland's office. (Doc. 93-7 ¶ 8; Doc. 109-1 ¶ 8). When Plaintiff arrived, Defendant Copeland was alone in his office and his invoices were displayed on his desk. (Doc. 93-7 ¶ 9; Doc. 109-1 ¶ 9). Defendant Copeland instructed Plaintiff to enter his office and close the door. (Doc. 93-7 ¶ 10; Doc. 109-1 ¶ 10). Defendant Copeland's office was a private room with no windows, so no one from outside his office could see inside once the door was closed. (Doc. 93-7 ¶ 12; Doc. 109-1 ¶ 12). Defendant Copeland frequently met with his subordinates in his office with the door closed. (Doc. 93-7 ¶ 24; Doc. 109-1 ¶ 24). Plaintiff complied with Defendant Copeland's instruction to close the door. (Doc. 93-

7 ¶ 11; Doc. 109-1 ¶ 11). After Plaintiff shut the door, Defendant Copeland motioned for her to come around the backside of his desk. (Doc. 93-7 ¶ 13; Doc. 109-1 ¶ 13). Plaintiff followed his instruction, and once she was on his side of the desk, a sexual encounter occurred between Plaintiff and Defendant Copeland. (Doc. 93-7 ¶ 14; Doc. 109-1 ¶ 14). The Parties agree that a sexual encounter occurred, but dispute whether it was consensual or not. (Doc. 93-7 ¶ 14; Doc. 109-1 ¶ 14).

Defendant Copeland had authority to correct Plaintiff's job-related behavior and issue formal written reprimands to Plaintiff for same at his own will. (Doc. 109-1 ¶ 16; Doc. 111-1 ¶ 16). Defendant Copeland was responsible for preparing written evaluations of his subordinates' performance, including Plaintiff, which were subject to review and approval by CMI's President. (Doc. 93-7 ¶ 17; Doc. 109-1 ¶ 17). CMI's President could accept or modify Defendant Copeland's compensation recommendations for his subordinates and Defendant Copeland could not hire or terminate subordinates without the approval of CMI's President. (Doc. 93-7 ¶ 17; Doc. 109-1 ¶ 17). CMI's President testified that he could not recall any particular instance when he had declined to follow Defendant Copeland's recommendations with respect to hiring, employee compensation, or employee discipline. (Doc. 111-1 ¶ 17; Doc. 93-6 at 11–12). However, Defendant Copeland did testify that there "were times where [CMI's President] had made adjustments [to his recommendations]" (Doc. 93-4 at 8). Defendant Copeland also attended trade shows and conferences on behalf of Defendant CMI, during which he would schedule lunches and dinners with CMI's suppliers at his discretion. (Doc. 93-7 ¶ 22; Doc. 109-1 ¶ 22).

The purchasing department (which included Plaintiff), the sales department, and the administrative team reported directly to Defendant Copeland. (Doc. 93-7 ¶ 19; Doc. 109-1 ¶ 19). Defendant Copeland had the authority to allocate work among his subordinates at his own discretion and to reprimand and discipline his subordinates. (Doc. 93-7 ¶ 20; *see* Doc. 111-1 ¶ 20). Plaintiff's refusal to complete a task Defendant Copeland assigned to her would be considered insubordination. (Doc. 93-7 ¶ 21; *see* Doc. 111-1 ¶ 21). Plaintiff was required to walk past Defendant Copeland's office every time she entered or exited the office. (Doc. 93-4 at 9). She was also required to turn in her car keys to Defendant Copeland every time she entered or exited the building, at least in part as a measure to address her ongoing attendance and tardiness issues. (Doc. 93-7 ¶ 25; Doc. 109-1 ¶ 25; Doc. 111-1 ¶ 25; Doc. 93-4 at 9).

Defendant Copeland's job duties also included ensuring Plaintiff's safety by (1) knowing, following and enforcing CMI's policies including their written anti-sexual harassment policy, (2) making sure that his subordinates, including Plaintiff, were provided with a safe environment to do their work, (3) modeling professional behavior for his subordinates, including Plaintiff, (4) managing the morale of his subordinates, including Plaintiff, and (5) protecting his subordinates from being sexually abused or harassed at work. (Doc. 93-7 ¶¶ 18, 26; Doc. 109-1 ¶¶ 18, 26).

Prior to the alleged assault, in early 2022, a former female subordinate of Defendant Copeland reported to Defendant CMI that Defendant Copeland made multiple sexually inappropriate comments to her, and further reported that she had

seen a text message from Defendant Copeland to Plaintiff that was sexually inappropriate. (Doc. 93-7 ¶ 27; Doc. 109-1 ¶ 27; Doc. 93-6 at 18). CMI's President understood the text message to constitute sexual harassment. (Doc. 111-1 ¶ 27; Doc. 93-6 at 163; Doc. 93-6 at 18).

After the former female subordinate reported Defendant Copeland's comments, CMI immediately began an investigation and interviewed certain employees, including Plaintiff. (Doc. 93-7 ¶ 28; Doc. 109-1 ¶ 28). During Plaintiff's interview, she reported that: such comments from Director Copeland were "the norm"; there were too many such comments for Plaintiff to even report them all; Plaintiff felt she had to just let it happen to keep from getting in trouble because Defendant Copeland would "come at her for anything" and he would get "aggressively, screaming loud"; and Defendant Copeland's treatment of her was causing her to have nightmares and was made it so difficult for Plaintiff to perform her job that she'd been "in survival mode" for the last three to four years. (Doc. 93-7 ¶ 28; Doc. 109-1 ¶ 28). Plaintiff also communicated at times that: while Defendant Copeland's text message was said in a "joking" manner, it was "inappropriate" and it "embarrassed" her; she wished she was not involved in the sexual harassment complaint because she was afraid of retaliation; that "nothing happens when we go to HR"; and she had to accept Defendant Copeland's inappropriate remarks to keep from getting in trouble. (Doc. 111-1 ¶ 28; Doc. 111-9 at 2; Doc. 111-10 at 2; Doc. 111-7 at 15; Doc. 111-11 at 2; Doc. 111-8 at 7).

Defendant Copeland admitted to sending the text message to Plaintiff. (Doc.

109-1 ¶ 29; Doc. 111-1 ¶ 29). He remained in his then-current position. (Doc. 109-1 ¶ 29; Doc. 111-1 ¶ 29). After the March 2022 investigation, CMI's President testified that he "intentionally walk[ed] downstairs [more often]" to "check on things." (Doc. 109-1 ¶ 29; Doc. 111-1 ¶ 29; Doc. 109-6 at 12). However, he also testified that doing so was not a "new" form of monitoring, but rather a continuation of "ongoing coaching" to Defendant Copeland. (Doc. 111-1 ¶ 29; Doc. 111-8 at 10). CMI's President also informed Defendant Copeland that if CMI received another complaint about him, his employment would be terminated. (Doc. 93-7 ¶ 29; Doc. 109-1 ¶ 29). Defendant Copeland stated that after the March 2022 Investigation, CMI's President was "listening a little closer to conversations [he] had . . . in the office." (Doc. 93-7 ¶ 31; Doc. 109-1 ¶ 31). However, when Defendant Copeland was asked whether he was "punished in any way" or suffered "any negative consequences at all" as a result of the March 2022 investigation, he testified "[n]o, not that I can recall[,]" besides being required to apologize, warned about termination, and CMI's President listening closer to his conversations. (Doc. 111-1 ¶ 31; Doc. 111-12 at 3). CMI recommended that Defendant Copeland attend anger management classes but left it up to Defendant Copeland's own discretion whether he would accept that recommendation, which he declined to do because "he didn't feel that he needed [it.]" (Doc. 93-7 ¶ 30; Doc. 109-1 ¶ 30).

## II. LEGAL STANDARD

A district court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Funches v. Progressive Tractor & Implement Co., L.L.C.*, 905 F.3d 846, 849 (5th Cir. 2018) ("This occurs when a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

For issues on which the movant bears the burden of proof at trial, they "must come forward with evidence which would entitle [them] to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence establishing a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

Where the nonmovant bears the burden of proof at trial, the moving party must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the claim. *See Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 885 (1990). Once the movant shows entitlement to judgment as a matter of law, the nonmovant must bring forward evidence to create a genuine issue of material fact. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).

## III. DISCUSSION

Plaintiff moves this Court to rule that Defendant CMI is vicariously liable for the alleged sexual assault committed by its employee, Defendant Copeland.

### A. Whether The Issue Of Vicarious Liability Is Ripe For Consideration.

It has yet to be determined whether Defendant Copeland committed a tort. While the Parties agree that a sexual encounter between Plaintiff and Defendant Copeland occurred on May 26, 2023, they dispute whether the sexual encounter was consensual or not. Plaintiff argues that, though a finding of tortious conduct has not been made, the issue of vicarious liability is ripe for consideration. Defendant CMI, in turn, contends that a ruling on the issue of vicarious liability should only be issued after a factual finding of tortious conduct.

Precedent establishes that the Court may rule on the issue of vicarious liability prior to a finding of tortious conduct. *See Doe v. Morris*, No. CIV.A. 11-1532, 2013 WL 3933928, at *1–*3 (E.D. La. July 30, 2013) (granting summary judgment on the issue of vicarious liability before it was established whether the sexual encounter was consensual); *Lousteau v. Congregation of Holy Cross S. Province, Inc.*, No. CV 21-1457, 2025 WL 1432252, at *4 (E.D. La. May 19, 2025) (granting summary judgment on the issue of vicarious liability before it was established whether the sexual encounter occurred). If the underlying tort claim against Defendant Copeland in this case is eventually dismissed, so too will the vicarious liability claim be dismissed. ("Though [the employee] may have been in the course and scope of employment, all underlying tort claims in this case have been dismissed. Without some underlying

liability of [the] employee, [the employer] cannot be vicariously liable." *Miller v. Target Corp.*, 854 F. App'x 567, 570 (5th Cir. 2021) (dismissing a vicarious liability claim after dismissing the underlying tort claims).) Therefore, the Court may rule on the issue of vicarious liability now.

**B. Whether Defendant CMI Is Vicariously Liable.**

Under Louisiana Civil Code article 2320, "an employer is subject to vicarious liability for the tortious conduct of his employee, irrespective of his title, while acting within the course and scope of employment." *Brasseaux v. Town of Mamou*, 752 So. 2d 815, 821 (La. 2000). The following factors are considered when determining whether an employee's tortious conduct occurred within the course and scope of employment: (1) whether the tortious act was primarily employment rooted; (2) whether the [act] was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment. *Baumeister v. Plunkett*, 95-2270 (La. 5/21/96), 673 So. 2d 994, 996–97.

All four of these factors need not be met before vicarious liability may be found. *Id.* at 997. But an employer is not vicariously liable merely because his employee commits an intentional tort on the employer's premises during working hours. *Id.* Each case must be decided on its specific facts. *Id.*

"While the course of employment test refers to time and place, the scope of employment test examines the employment-related risk of injury. The inquiry requires the trier of fact to determine whether the employee's tortious conduct was

so closely connected in time, place and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests." *Russell v. Noullet*, 98-0816 (La. 12/1/98), 721 So. 2d 868, 871.

"Generally speaking, an employee's conduct is within the course and scope of his employment if the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer." *Orgeron on Behalf of Orgeron v. McDonald*, 93-1353 (La. 7/5/94), 639 So. 2d 224, 226–27. However, "specific conduct may be considered within the scope of employment even though it is done in part to serve the purposes of the servant or of a third person. The fact that the predominant motive of the servant is to benefit himself . . . does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service." *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 476–77 (La. 1990) (cleaned up). In intentional tort cases, courts determine "whether the tortious act itself was within the scope of the servant's employment. . . ." *Id.* at 478.

"The scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks . . . [because] the greater potential course of employment expands the servant's potential opportunities to commit torts. *Id.* at 477 (cleaned up). Courts have also

determined that vicarious liability attaches even the sexual assault is unauthorized or strictly prohibited by the employer: "[T]he fact that an act is forbidden or is done in a forbidden manner does not remove that act from the scope of employment." *Id.* at 479.

Defendant CMI does not contest that Defendant Copeland was its employee and that the May 26, 2023 sexual encounter occurred at the CMI office during working hours. (Doc. 109 at 6). Therefore, the Court will analyze: (1) whether the tortious act was primarily employment rooted and (2) whether the act was reasonably incidental to the performance of Defendant Copeland's duties. *See Baumeister*, 673 So. 2d at 996–97.

Plaintiff contends that both factors are met here. Plaintiff cites a number of cases in which Louisiana courts have found sexual assaults to be employment rooted and reasonably incidental to employment when the employee uses a position of authority to isolate or otherwise control the victim for purposes of committing a sexual assault. *See Latullas v. State*, 94-2049 (La. App. 1 Cir. 6/23/95), 658 So. 2d 800 (vicarious liability attached when prison guard ordered inmate to secluded area to ostensibly clean prison trailers and then sexually assaulted her, because "it was through [his] duties that [the] opportunity arose[,] "even though the assault was "totally unauthorized . . . and motivated by . . . personal desires[.]"); *Dismuke v. Quaynor*, 637 So. 2d 555 (La. Ct. App.), *writ denied*, 94-1183 (La. 7/1/94), 639 So. 2d 1164 (vicarious liability attached when camp counselor, while supervising camp attendees at a student union, dragged one camp attendee into a secluded area and

then sexually assaulted her, because one of his "motives, albeit secondary, for going to the [s]tudent [u]nion, promoted [the employer's] interest in, or implemented its expressed policy, of closely supervising [camp attendees]"); *Turner v. State*, 494 So. 2d 1292 (La. Ct. App. 1986) (vicarious liability attached when recruiting officer responsible for interviewing potential female recruits sexually assaulted the interviewees, even though the assault was "totally unauthorized by the employer and obviously motivated by his personal interests"); *Samuels v. S. Baptist Hosp.*, 594 So. 2d 571 (La. Ct. App.), *writ denied*, 599 So. 2d 316 (La. 1992) (vicarious liability attached when nursing assistant sexually assaulted a patient, even though the assault was "totally unauthorized by the employer and motivated by the employee's personal interest," because the employer "placed the employee . . . in a position of authority and contact with the victim"); *Edmond v. Pathfinder Energy Servs., Inc.*, 2011-151 (La. App. 3 Cir. 9/21/11), 73 So. 3d 424, *writ denied*, 2011-2234 (La. 12/16/11), 76 So. 3d 1204 (vicarious liability could attach when supervisor instructed subordinate to go to secluded location and then sexually assaulted him, because the supervisor "was using his supervisory powers to direct [the victim] to the location where the attack occurred[,]" even though the assault was "totally unauthorized by the employer and motivated by the employee's personal interest"); *Harrington v. Louisiana State Bd. of Elementary & Secondary Educ.*, 97-1670 (La. App. 4 Cir. 5/20/98), 714 So. 2d 845, *writ denied sub nom. Harrington v. Veller*, 98-2170 (La. 11/20/98), 728 So. 2d 1287 (vicarious liability attached when instructor "abused his position of authority" off-campus to sexually assault a student);

*Applewhite v. City of Baton Rouge*, 380 So. 2d 119 (La. Ct. App. 1979) (vicarious liability attached when police officer ordered victim into patrol car and then sexually assaulted her); *Doe v. ABC Sch.*, 2019-0983 (La. App. 1 Cir. 12/17/20), 316 So. 3d 1086, *writ denied*, 2021-00098 (La. 3/9/21), 312 So. 3d 582 (vicarious liability attached when school janitor responsible for cleaning bathrooms sexually assaulted student in bathroom because "the opportunity to sexually assault [the victim] in the school's bathroom was at least partly actuated by [the janitor's] purpose of acting for his employer"); *Doe v. Morris*, No. CIV.A. 11-1532, 2013 WL 3933928, at *1 (E.D. La. July 30, 2013) (vicarious liability attached when police officer assaulted the victim after driving her home, because the officer "was in a position to commit the sexual act only because of the authority of his position[.]").

Defendant counters that the cases cited by Plaintiff are inapplicable because they involve instances in which the assaulter's employment duties "required custodial control, physical supervision, protection, or coercive authority" over the victim and "the torts arose out of the very authority bestowed upon the tortfeasor." (Doc. 109 at 8). Defendant also adds that the mere existence of supervisory authority alone does not transform a tort into employment-rooted conduct.

The Court finds that here, Defendant Copeland acted within the course and scope of his employment during the alleged sexual assault. Defendant Copeland held a position of coercive authority over Plaintiff, one which he abused to bring about the sexual encounter. Defendant Copeland had significant discretion to allocate work among his subordinates at his own discretion, to reprimand and discipline his

subordinates, and to propose compensation recommendations for his subordinates. Plaintiff was also required to comply with Defendant Copeland's instructions, and her refusal to do so would be considered insubordination. It was with his supervisory authority that he instituted rules and practices requiring Plaintiff to walk past his office when she was in the office, to give him her car keys when she was in the building, and to instruct his employees in his windowless, shut-door office. Indeed, during the encounter at issue, he specifically directed Plaintiff to enter his office ostensibly for work-related reasons.

The alleged assault was reasonably incidental to the performance of Defendant Copeland's employment duties. He testified that he called Plaintiff into his office with the partial intention of going over work-related invoices, conduct that served Defendant CMI's interest to an appreciable extent. Though the assault was prohibited by Defendant CMI and instead motivated by Defendant Copeland's personal interests, the opportunity to commit the assault arose from the position of authority he held over her and the significant discretion he had over her working conditions.

It is also relevant that Defendant Copeland had previously been reported for sexual harassment. The fact-finder could conclude that Defendant Copeland's sexual encounter with Plaintiff was foreseeable. *See Carnes v. Wilson*, 48,127 (La. App. 2 Cir. 7/3/13), 118 So. 3d 1275, 1279 (imposing vicarious liability in part because employer was aware of employee's previous violent altercations); *Michot v. Edward D. Jones & Co., L.P.*, No. 1:18-CV-0921, 2018 WL 11507827, at *6 (W.D. La. Sept. 20,

2018), *report and recommendation adopted*, No. CV 18-0921, 2018 WL 11507826 (W.D. La. Oct. 10, 2018) (plaintiff could prove that employer was vicariously liable because her supervisor "had been placed in a supervisory position over her in a remote office, despite [the employer's] knowledge of past sexual harassment by [the supervisor]. . . . [His] conduct would be 'quite foreseeable and reasonably incidental' to his employment based on the prior incidents alleged and sufficiently 'employment rooted' given the supervisory relationship and isolation that [the supervisor] was allegedly able to exploit").

Accordingly, the Court finds that Defendant Copeland was acting within the course and scope of his employment, and Plaintiff is entitled to summary judgment that Defendant CMI is vicariously liable for his alleged tortious conduct.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Plaintiff's **Motion For Partial Summary Judgment On The Issue Of Vicarious Liability (Doc. 93)** is **GRANTED**.

Baton Rouge, Louisiana, this 16th day of September, 2026

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**